McKEE, Chief Judge,
concurring.
I. Introduction
More than three decades ago, Justice Brennan cautioned:
[Ejyewitness testimony is likely to be believed by jurors, especially when it is offered with a high level of confidence, even though the accuracy of an eyewitness and the confidence of that witness may not be related to one another at all. All the evidence points rather strikingly to the conclusion that there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says ‘That’s the one!’[1]
James Dennis was sentenced to death because three eyewitnesses appeared at trial and confidently pointed their fingers at him when asked if they saw Chedell Williams’ killer in the courtroom. The prosecution later told the jury that if they believed these witnesses, they should convict James Dennis of first degree murder. And they did.
The Dissent would deny Dennis relief in large part because it believes that “the evidence against Dennis was strong.”[2] According to the Dissent, “it is hard to discount the identification testimony of three eyewitnesses.”[3] Yet, nearly half a century of scientific research teaches that eyewitness testimony can be one of the greatest causes of erroneous convictions. The jurors in Dennis’ trial, like many juries, were never properly instructed about the dangers of eyewitness identifications. The jury charge given in this ease failed to equip them with the knowledge necessary to accurately assess the reliability of the three eyewitnesses who pointed their fingers at James Dennis and said, “He’s the one.”
I therefore write separately to underscore the problems inherent in eyewitness testimony and the inadequacies of our standard jury instructions relating to that evidence. Jury instructions must educate jurors on the relevant scientific findings regarding eyewitness reliability in order to mitigate the dangers associated with inaccurate eyewitness identifications. The standard instructions, which were used here, are not only insufficient, they are misleading. However, I join the Majority’s *314 thoughtful explanation of why Dennis is entitled to relief under AEDPA’s stringent standard of review in its entirety.
In the last thirty years, over 2,000 studies have examined human memory and cognition and their relationship to the reliability of eyewitness identifications.[4] This impressive body of scholarship and research has revealed that eyewitness accounts can be entirely untrustworthy. As the International Association of Chiefs of Police has concluded, “[o]f all investigative procedures employed by police in criminal cases, probably none is less reliable than the eyewitness identification.”[5]
Yet, the law has not caught up to the science. The Innocence Project has documented that, nationwide, eyewitness mis-identifications have been a factor in seventy-five percent of the wrongful convictions that were subsequently overturned by DNA evidence.[6] One of the most powerful and prominent examples of such a wrongful conviction is the story of Ronald Cotton and Jennifer Thompson. In July 1984, a man broke into Thompson’s apartment and raped her at knife point.[7] When shown a photo array three days later, Thompson tepidly selected Cotton as her attacker.[8] “I' think this is the guy,”[9] she said, pointing to Cotton’s photo. The lead detective then asked her if she was sure, and she responded, “Positive.”[10] But belying her professed certainty, she then asked the detective, “Did I do OK?”[11] He reassured her, “You did great.”[12] About a month later, Thompson viewed a five lineup, in which Cotton was the only one repeated from the prior photo array.[13] When Thompson positively identified Cotton from that lineup, she stated that she was certain he was the one who had attacked her;[14] Cotton was then arrested and charged with one count of rape. At his trial, Thompson testified that she was “absolutely sure” that Cotton *315 was her rapist.[15] There was no corroboration of her identification, and she admitted that she had not been wearing her eyeglasses at the time of the attack.[16] Nonetheless, a jury convicted Cotton on the strength of Thompson’s positive identification.[17] Cotton was sentenced to life in prison plus fifty-four years.[18]
The story does not end there. In prison, Cotton learned that a fellow inmate named Bobby Poole had admitted raping Thompson to another inmate. Based on this information, Cotton managed to win a new trial.[19] At that retrial, Thompson had an opportunity to view Poole. Her reaction: “I have never seen him in my life.”[20] As Thompson later recounted in an interview about the case, when she was asked to look at Poole during Cotton’s second trial, she was angry: “I thought, ‘how dare you. How dare you question me? How dare you try to paint me as someone who could possibly have forgotten what my rapist looked like, I mean, the one person you would never forget. How dare you.’ ”[21]
Based on Thompson’s unequivocal affirmation of her identification of Cotton, he was once again convicted. He served over a decade in prison before DNA tests finally confirmed that Cotton was innocent and Poole was, in fact, the rapist.[22] As one legal commentator described this case, “[t]he fallibility of eyewitness testimony and the malleability of memory could not be clearer, as here a crime victim had seen the scientifically proven perpetrator but instead saw Cotton’s face as that of her assailant.”[23]
As I will elaborate below when I discuss the even more remarkable story of John White’s erroneous conviction, Cotton’s story cannot readily be dismissed as a fluke. Moreover, problems of erroneous identification remain even where more than one eyewitness identifies the same person as the perpetrator. In thirty-eight percent of misidentification cases documented by the Innocence Project, multiple eyewitnesses misidentified the same innocent person.[24] Almost without exception, eyewitnesses who identify the wrong person, express complete confidence that they chose the real perpetrators.[25]
We should therefore find precious little solace in the fact that three eyewitnesses fingered James Dennis. As I will discuss, the procedures used to elicit the identifications of Dennis and the circumstances surrounding the crime raise serious questions about the accuracy of those identifications. The voluminous studies conducted on the subjects of memory and eyewitness identifications make it painfully clear that many of the identification procedures used in this case were inconsistent with the fundamental concept of neutral inquiry. As a *316 result, these identifications lack many of the basic indicia of reliability. Yet, the jury that convicted Dennis was completely unaware of these problems. In addition, the jurors were never even informed that five other eyewitnesses, with similar or better opportunities to observe the shooting, either could not identify Dennis as Chedell Williams’ killer or identified someone else. Accordingly, the three courtroom identifications do little to assuage my concerns about the reliability of the identification testimony that the jury considered. Rather, I cannot help but wonder if an innocent man may have spent more than two decades on death row.
It is as obvious as it is tragic that mistaken identifications have disastrous effects for the unjustly accused. That is particularly true where — as here — the death penalty is imposed. But wrongful convictions are not the only consequence of our continued failure to incorporate the teachings of scientific research into judicial proceedings. Mistaken identifications “also erode public confidence in the criminal justice system as a whole.”[26] In addition, when someone is wrongfully convicted, the real perpetrator remains free to victimize again. Thus, this is an issue of far-reaching importance to the defense, prosecutors, police departments, as well as to judges: All have an interest in minimizing the possibility of erroneous identifications. The New Jersey Supreme Court accurately described the situation in its landmark decision discussing eyewitness identifications: “At stake is the very integrity of the criminal justice system and the courts’ ability to conduct fair trials.”[27]
Before I begin my discussion of the science as applied to this case, I want to emphasize that my point here is not to cast aspersions on the motives of the police or prosecutors involved in this investigation or to insinuate that they intentionally used suggestive procedures to convict Dennis. On the contrary, I have no reason to believe they were motivated by anything other than a sincere desire to bring the killer of Chedell Williams to justice. The science surrounding eyewitness identifications and reliability was simply not as well-understood at the time of Dennis’ investigation and trial as it is today.
II. The Identifications
A. The Crime
As the Majority recounts and the Dissent emphasizes, the shooting at issue here occurred in broad daylight, at the intersection of Tenth Street and Nedro Avenue, in Philadelphia. This intersection is adjacent to the Fern Rock SEPTA station, where steps lead up to a ticketing office. On October 22, 1991, Chedell Williams and her friend Zahra Howard walked up these steps so that Williams could purchase a SEPTA Transpass. As they climbed the steps on opposite sides of a railing that extended up the middle, two men approached them head on. A man with a, red sweat suit — whom witnesses later uniformly described as the shooter — initially approached Howard on her side of the railing and demanded her earrings. The women fled, and Howard managed to hide behind a nearby fruit stand while the man in the red sweat suit pursued Williams into the intersection of Tenth and Nedro. Howard later stated that, up until that point, she had not seen a gun. Howard watched as the man in the red struggled to take *317 Williams’ earrings, pulled her close to him, and shot her in the neck with a “silver revolver.”[28] Williams fell to the ground, and both men ran north on Tenth Street.
Five other witnesses gave similar accounts of the shooting in police interviews conducted the day of the murder. First, James Cameron, a SEPTA cashier, stated that he was standing at Tenth Street and Nedro Avenue, chatting with another SEPTA employee, when he saw a man grab Williams in the street, pull out a “dull silver gun,” and shoot her.[29]
As the two .perpetrators fled, they ran past Anthony Overstreet and Thomas Bertha. Overstreet and Bertha were working on a house on North Tenth Street, near the intersection where the shooting occurred. After hearing screaming followed by a gunshot, both men saw Williams fall to the ground as the two perpetrators ran directly toward them. Both Overstreet and Bertha observed the man in the red sweat suit holding a chrome-plated gun in his hand.
Overstreet’s initial interview with police is particularly important because he expressed confidence that he would be able to identify the shooter if he saw him again. Overstreet was about six feet from the perpetrators as they ran past him. In his interview, he recounted that they “both looked right in my face” as they fled.[30] Moreover, Overstreet told officers that “he would definitely be able to identify them” because “he ha[d] seen the man with the red hooded jumpsuit who had the gun before.”[31] Overstreet then explained that he might have known the shooter from the “area of Broad & Clearview St[reets] where he used to hang.”[32] He later clarified that he thought he had seen the shooter at a house where Overstreet used to smoke cocaine, and he gave the police the address of that house.
Another eyewitness who expressed confidence he could identify the shooter was George Ritchie. At the time of the shooting, Ritchie'was repairing a car on Tenth Street. “He heard 2 [black men] hollering and running away from the train station and towards him in the middle of 10th St.”[33] Ritchie was about twenty-five feet away from them and “saw them clearly.”[34] He told police that “he did get a good look at these two [black males] and can identify them if he sees them again.”[35]
Another eyewitness, Clarence Verdell, had an opportunity to view the perpetrators immediately prior to the shooting and provided the police with a detailed description of the accomplice’s face. Verdell saw the perpetrators as they initially chased Williams and Howard down the ticketing office steps. A moment later, Verdell heard what sounded like a firecracker. He then turned and saw Williams fall to the ground. Verdell never saw the gun and had never seen either the girls or the males before. He told his interviewer that he would be able to recognize the accomplice, but did not get a good look at the shooter.
Finally, police interviewed David LeRoy, a vendor who sold hot dogs at Tenth and Nedro. He stated that he saw the shooter pull Williams toward him and kill her. He noted that the shooter had on a red hat, pulled down to his eyes.
*318 Two weeks after the crime, the police interviewed a fruit vendor and his son, Joseph DiRienzo and Joseph DiRienzo, Jr. They had also been present at the murder scene and echoed the description of the crime provided by the other witnesses.
B. The Photo Arrays
A few days after the shooting, the police heard rumors that James Dennis might have been the shooter, and they decided to show witnesses photo arrays containing his picture. The detectives compiled three arrays of eight photographs each. Dennis’ picture was placed in the first position of the first array, and police used this array to solicit an identification of the shooter (the second array was used to attempt identification of the accomplice, and the third was shown thereafter to offer the witnesses one more opportunity to identify a suspect). At trial, Detective Manuel Santiago explained how he compiled the array: he used the “most recent photo”[36] that he could find of Dennis and then “went into [police] files and obtained photos of young black males, which would not be too unlike the photo of Mr. James Dennis.”[37] When Detective Santiago showed the witnesses the arrays, he instructed them: “I’m going to show you a photograph spread with eight photos. See if you recognize anyone.”[38]
Only four of the nine eyewitnesses could make any identification from the arrays: Zahra Howard, Thomas Bertha, Anthony Overstreet, and James Cameron indicated that Dennis “look[ed] familiar.”[39] However, none of these witnesses was initially certain about their “identifications.” For example, when Detective Santiago showed Howard the arrays; she pointed to Dennis and stated, “[t]his one looks like the guy, but I can’t be sure.”[40] Detective Santiago next showed the same spreads to James Cameron. When asked if he recognized anyone, Cameron stated,'“#1 looks familiar but I can’t be sure.”[41] When provided the same arrays, Bertha pointed to Dennis and stated, “[t]hat looks like the one that was running with the gun.”[42] Santiago probed further: “Can you be sure that photo #1 is the male that you saw get away from the girl and run at you with the gun after the gunshot?”[43] It was then that Bertha replied, “Yes I can.”[44] Detective Santiago’s follow-up question and Bertha’s response bear an eerie resemblance to the follow-up question asked of Jennifer Thompson (“Are you sure?”) after her response (“Positive”) following her initial tentative selection of Ronald Cotton from a photo array.
A different detective showed Anthony Overstreet the arrays. After Overstreet had reviewed the first array, the detective asked “[i]s there anyone in these photos that you can identify?”[45] Overstreet replied: “Yes, in the first set of photos, #1 looks like the male who shot the girl.”[46] The detective then asked Overstreet to repeat his identification: “The male that you identified, is he the male you saw running up the street with the gun?” “Yes he is,” Overstreet confirmed.[47] Thus, when *319 asked about the male that he had “identified,” Overstreet moved from saying that Dennis’ picture “looked like” the shooter to affirming that Dennis “is” the shooter. This may, at first, appear to be a meaningless distinction that is nothing more than innocuous reply to a simple follow-up question. However, as I will discuss in greater detail below, such subtle, and seemingly innocent, probes can sow seeds that blossom into certain, albeit inaccurate, identifications.[48]
Significantly, none of the remaining five eyewitnesses selected Dennis from the photo arrays. When a detective showed Verdell the spreads, he stated, “The best I can say is it’s either #1, #5, or #8. I concentrated more on the male that was directly behind Chedell and I believe him to be the accomplice.”[49] Verdell returned to the police station a few days later to reexamine the photos. The second time around, he stated “it would be either #1 or #8 who was the [shooter], I lean more towards #1 because of the build of the male but he definitely doesn’t have that cut of hair now. I definitely do not remember him having his hair cut that way.”[50] Neither David LeRoy nor either of the DiRienzos identified Dennis from the arrays.
Finally, the Commonwealth denies that police ever showed George Ritchie a photo array. Ritchie vigorously disputes this claim. In 2005, Ritchie testified at Dennis’ Post-Conviction Relief hearing that officers showed him an array during their investigation but became frustrated when Ritchie was unable to identify the shooter from the photos. Assuming arguendo that the Commonwealth’s claim regarding Rit-chie is true, that means that the police and prosecution did not attempt to learn if Ritchie vyould have identified Dennis or someone else as the shooter even though Ritchie had initially expressed confidence in his ability to identify the shooter.
C. The Lineup
On December 19, 1991, about a month and a half after the police showed the witnesses the photo arrays, officers conducted an in-person lineup involving Dennis and five fillers. Fillers are non-suspects who are added to the line-up to provide the witnesses with choices. Although Dennis’ attorney requested that all eyewitnesses be present, only the witnesses who had identified Dennis from the photo array (Howard, Cameron, Bertha, and Over-street) participated.
The police had those four witnesses view the lineup at the same time, in the same room. Accordingly, nothing prevented the witnesses from observing each other’s reactions. As I elaborate below, studies consistently caution against conducting a lineup in this fashion.[51] At trial, one of the officers that helped conduct the lineup, Detective William Wynn, testified that the following' instructions were given to the four witnesses:
We’re going to view a lineup of six men. They’ll be numbered from one through six from your left to your right.... I want you to look at each man carefully, see if you can identify any of these men as being involved in your incident. If you can identify any of these men, just remember the number of the man that you can identify, and when we’re through looking at all six men, I’ll order them out of this viewing area or box, as we call it. At that time I will call you outside of the lineup room, one at a time by *320 name, and ask you as to whether or not you can make an identification. If you can, just tell me the number of the man that you can identify. If you can’t, simply tell that you cannot. It’s important that while you’re in the lineup room, there will be no pointing, talking, shouting or displaying of emotions so as not to influence one another’s decision. It will be important to you not only this evening but also at a later date.[52]
After the witnesses viewed each person in the lineup, the police called them out of the room, one by one, and asked if they could make an identification.
Cameron and Bertha identified Dennis. Howard pointed out Dennis, but was less sure, stating only “I think it was [him].”[53] Overstreet — the witness who initially expressed the most confidence in his ability to identify the shooter due to his alleged prior exposure to him — identified an entirely different person from the lineup.
D. In-Court Identifications
At Dennis’ trial over a year later, the prosecution called only the three witnesses who had picked him from the photo arrays and lineup. When asked whether Chedell Williams’ killer was in the courtroom, Bertha, Cameron, and Howard each confidently pointed to Dennis, even though all three had expressed doubt in their earlier identifications.
III. The Science of Eyewitness Identifications
As I noted at the outset, we have long known that eyewitness identifications are not-always as reliable as witnesses (and jurors) may believe them to be. In 1927, long before the explosion of research in this area, Justice Felix Frankfurter wrote: “[t]he hazards of [eyewitness identification] testimony are established by a formidable number of instances in the records of English and American trials.”[54] In 1932, well before the availability of DNA analysis, Yale Law professor Edwin M. Borchard documented almost seventy cases involving eyewitness errors that caused miscarriages of justice.[55] Over thirty years later, the Supreme Court acknowledged this problem in United States v. Wade.[56] There, the Court famously proclaimed that “[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.”[57]
In the ensuing decades, the scientific community has made significant strides in understanding this phenomenon.[58] A combination of basic and applied research on human visual perception and cognition has revealed that the reliability of eyewitness *321 identifications is largely contingent on the conditions under which memories are created, stored, and then later recalled. “At its core, eyewitness identification relies on brain systems for visual perception and memory: The witness perceives the face and other aspects of the perpetrator’s physical appearance and bearing, stores that information in memory, and later retrieves the information for comparison with the visual percept of an individual in a lineup.”[59] Research has shown that certain variables can impact the processes of these memory functions with serious implications for the reliability of the subsequent memories. These variables generally fall into two basic categories: system variables and estimator variables.
A. System Variables
System variables are the procedures and practices law enforcement use to elicit eyewitness identifications.[60] Examples of system variables include the instructions law enforcement officers give to witnesses when they ask them to provide identifications, the comments of police to witnesses during the identification process, and the types of procedures (lineup, photo array, etc.) used to solicit the identification. These factors are important not only because they heavily influence the reliability of identifications, but also because they largely lie within the exclusive control of the criminal justice system. The following section- explores a few critical system variables and their effects on the accuracy of eyewitness identifications.
1. Blinded versus Non-Blinded Procedures
One of the most important system variables that law enforcement can control is the blinding of identification procedures.[61] Blinding occurs when the officer administering an identification procedure, such as a photo array, knows who the suspect is but cannot determine when the witness is viewing the suspect’s photo. “In one common ‘blinded’ procedure, the officer places each photo in a separate envelope or folder and then shuffles the envelopes/folders so that only the witness sees the images therein.”[62] This blinding can also be doubled: for example, when an officer who neither knows the suspect’s identity nor position in the photo array shows the array to an eyewitness. Such blinding is used to prevent the officer from giving the witness conscious or unconscious cues that can affect the witness’ identification.[63]
Common sense suggests that idéntification procedures administered without some degree of blinding are inherently untrustworthy, and research confirms this.[64] Typically, the greater the level of blinding, the more reliable the procedure. One of the foremost experts on eyewitness identifications has concluded that blind lineup administration is “the single most important characteristic that should apply to eyewitness identification.”[65] Social psychologists believe this is crucial to avoiding the “expectancy effect”: “the tendency for experimenters to obtain results they expect ... because they have helped to shape that *322 response through their expectations.”[66] In a seminal meta-analysis of 345 studies across eight broad categories of behavioral research, researchers found that “[t]he overall probability that there is no such thing as interpersonal expectancy effects is near. zero.”[67] “Even seemingly innocuous words and subtle cues — pauses, gestures, hesitations, or smiles — can influence a witness’ behavior.”[68] Moreover, the witness usually remains completely unaware of the signals she has been given or their effect on her identification.
Outside the realm of law enforcement, in scientific experiments for instance, it is standard practice to use blinding. The importance of blind administration is so great that a failure to implement such a policy can affect even seemingly objective processes, such as the analysis of DNA samples. In one experiment, researchers gave seventeen experienced DNA analysts a mixed sample of DNA evidence from an actual crime scene — a gang rape committed in Georgia.[69] All seventeen analysts worked at the same accredited government laboratory in the United States.[70] Years earlier, prosecutors had relied on this evidence to convict a man named Kerry Robinson.[71] In the real investigation, two analysts from the Georgia Bureau of Investigation concluded that Robinson “could not be excluded” as a suspect based on his DNA profile relative to the crime scene sample.[72] Nevertheless, of the seventeen analysts involved in the study of this case, only one agreed that Robinson “could not be excluded.”[73] Four analysts found that the evidence was inconclusive, and the-other twelve said he could be excluded.[74] All seventeen analysts were blinded to contextual information about the case.[75] Experts speculated that a failure to blind the DNA testing in the real investigation could explain the inconsistency between the results the Georgia Bureau of Investigation and the seventeen independent analysts obtained. “The difference between you giving them the data and saying ‘what do you make of it?’ and the local district attorney giving them the data and saying ‘We’ve arrested someone, is his profile in here?’ is huge.”[76]
The Supreme Court has recognized the significance of such cues for decades. In 1967, in United States v. Wade, the Court ruled that a pretrial lineup is a “critical stage” of prosecution at which a defendant had a right to the presence of counsel.[77] The Court explained:
*323 The fact that the police themselves have, in a given case, little or no doubt that the man put up for identification has committed the offense, and that their chief pre-occupation is with the problem of getting sufficient proof, because he has not “come clean,” involves a [ ] danger that this persuasion may communicate itself even in a doubtful case to the witness in some way.[78]
The importance of conscious and unconscious police persuasion cannot be overstated in the context of a trial because it negates the effect that strenuous cross-examination may otherwise have on the witness’ confidence in her identification. “[E]ven though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability.”[79] Obviously, if an eyewitness is completely unaware that her identification has been shaped by subliminal cues communicated by investigators, it is incredibly difficult, if not impossible, to dissuade that witness of the accuracy of her identification. As was true for Jennifer Thompson in the rape case discussed earlier, vigorous cross-examination may serve only to reinforce the witness’ certainty of her identification.[80] The Supreme Court recognized in Wade that once a pretrial identification is made, the identifying wildness becomes “the sole jury.”[81] Thus, “[t]he trial which might determine the accused’s fate may well not be that in the courtroom but that at the pretrial confrontation.”[82]
None of the identifications in Dennis’ case were obtained through processes that included blinding. The officers who showed the photo arrays and conducted the lineup knew that Dennis was the suspect, and they knew his position in the arrays and in the lineup. As the above studies make clear, it is entirely possible that the officers investigating Williams’ killing gave the witnesses unconscious cues about their suspicions. Dennis’ jurors would have been in a far better position to assess the reliability of the three courtroom identifications had they been informed of the importance of blinding procedures and their absence here.
2. Pre-Identification Instructions
The instructions police give witnesses prior to attempting to elicit an identification constitute a second important system variable. There, is broad consensus that police must instruct witnesses that the suspect may not be in the lineup or array and that the witness should not feel compelled to identify anyone.[83] In two meta-analyses, researchers found that providing this information to witnesses in advance significantly increased the reliability of the results in target-absent lineups.[84] In one study, the number of people that chose innocent fillers in target-absent lineups increased by forty-five percent when the lineup administrators failed to tell the subjects that they need not choose a suspect.[85]
*324 One hardly needs to engage in a protracted review of the wealth of data on this point to appreciate its implications. Without such instructions, witnesses may misidentify innocent suspects merely because they assume the suspect is present and the person misidentified bears the strongest resemblance to the actual perpetrator. Research confirms this.[86] It is therefore critical that courts inform jurors of this system variable where present. Such information enables jurors to consider the impact that the absence of such instructions may have had on witness identifications.
The record in Dennis’ case shows that the investigators failed to give such instructions to the witnesses. Accordingly, there is a real risk that the witnesses identified Dennis because he most closely resembled Williams’ killer. Indeed, that is a fair interpretation of this record. Upon seeing Dennis’ photo, Howard did not say “that’s him,” or “I think this is the shooter.” Instead, she tentatively told officers: “This one looks like the guy, but I can’t be sure.”[87] Like Howard, Bertha and Cameron also initially responded to these arrays in a manner that strongly suggests that they selected Dennis because his photograph bore a closer resemblance to the shooter than any of the fillers. They qualified their selection of Dennis by saying: “Number 1 looks familiar but I can’t be sure”[88]; and “that looks like the one that was running with the gun.”[89] It simply cannot be assumed that either statement was the equivalent of proclaiming: “that’s him,” or “he’s the one.”
3. Photo Array and Lineup Construction
Researchers have also found that the way that a photo array or live lineup is constructed can affect the reliability of the resulting identifications. A number of considerations are critical. First, not surprisingly, mistaken identifications are more likely where the suspect stands out in comparison to the fillers.[90] Using fillers that are relative look-alikes forces a witness to examine her memory, whereas placing the suspect among a group of individuals that bear little resemblance to him causes him to stand out. “[A] biased lineup may [also] inflate a witness’ confidence in the identification because the selection process seemed easy.”[91] As of yet, there is no clear agreement among researchers about whether fillers should more closely resemble a witness’ pre-lineup description of the suspect or the actual suspect.[92] However, whether the fillers more closely resemble *325 the suspect or the witness’ pre-lineup description, the fillers’ appearances should not make the suspect stand out.
Second, all lineups should include a minimum of five fillers.[93] The logic here, which appears to be a matter of general agreement, is again clear: the greater the number of choices, the less the chance of making a lucky guess, and the more the witness is forced to rely on her own memory to identify the suspect.
Third, for similar reasons, lineups should not feature more than one suspect. In its landmark decision on the issue of eyewitness identification, the Supreme Court of New Jersey emphasized that, “if multiple suspects are in the lineup, the reliability of a positive identification is difficult to assess, for the possibility of ‘lucky’ guesses is magnified.”[94]
The trial judge here noted that the composition of the lineup was somewhat suggestive because Dennis was slightly shorter than the rest of the participants, causing him to stand out. The jurors were therefore able to consider this disparity as they evaluated the reliability of the identifications. However, the court did not provide the jury with an explanation of how this may have affected the witnesses’ identifications of Dennis in that lineup. Nor did it give the jurors information that would allow them to consider the lineup construction in context with all of the other factors that were involved in the identifications of Dennis.
4. Interactions with Witnesses: Witness Feedback
Another critical system variable is whether law enforcement provides a witness with any feedback or other information in the course of her identification. As I touched on in my discussion of blinding procedures, “[t]he nature of law enforcement interactions with the eyewitness before, during, and after the identification plays a role in the accuracy of eyewitness identifications and in the confidence expressed in the accuracy of those identifications by witnesses.”[95] Elizabeth Loftus, a pioneering researcher in the field of human memory and cognition, has thoroughly documented the effects of received information on memory accuracy. In one study, she showed college students a video of a car crash on a country road.[96] Afterward, she asked them to estimate how fast the car was going. Half the students were asked how fast the car was going when it “passed the barn” along the country road; the other half were simply asked how fast the car was going “along the country road.”[97] A week later, she asked the same students whether they had seen a barn in the film. Approximately seventeen percent of the students who were given the “passed the barn” cue recalled seeing the barn in the video.[98] In contrast, less than three percent of the non-barn cue group remembered a barn.[99] In reality, there was no bam in the video.[100] This demonstrates the very subtle — yet extremely powerful— *326 effect statements at the time of memory recall can have.
In the eyewitness identification context, such information often comes in the form of pre- or post-identification information that may reinforce an identification. For example, research confirms the intuitive proposition that when investigators give cues that suggest “you got the right guy,” the witness’ confidence in the identification is artificially inflated. A meta-analysis of twenty studies covering 2,400 identifications found that witnesses who received feedback “expressed significantly more retrospective confidence in their decision compared with participants who received no feedback.”[101] Such feedback not only causes a witness to misjudge the reliability of her identification, it can also result in the witness embellishing the opportunity she had to observe the perpetrator and the crime. “Those who receive a simple post-identification confirmation regarding the accuracy of their identification significantly inflate their reports to suggest better witnessing conditions at the time of the crime, stronger memory at the time of the lineup, and sharper memory abilities in general.”[102] Furthermore, eonfirmational feedback need not be immediate to corrupt a witness’ memory. One study showed that the effects of eonfirmational feedback may be the same even when it occurs two days after an identification.[103] Other research further substantiates that these effects can withstand the passage of time.[104]
The particular perils of witness feedback are evident in many of the documented cases of false identifications. Here again, the story of Ronald Cotton and Jennifer Thompson is illustrative: officer feedback led Thompson to harden her false memory of Cotton as her rapist. In the process, her memory was effectively immunized from any impact cross-examination may otherwise have had on her confidence, which impeded the jury’s ability to properly assess her testimony.
I realize, of course, that law enforcement officials are not completely in control of the feedback witnesses receive. Interactions among witnesses outside the confines of police proceedings, for instance, can affect the reliability of the witnesses’ identifications.[105] For example, if one witness *327 talks to another, she can alter or reinforce the other’s memory of the same event. “[P]ost-identification feedback does not have to be presented by the experimenter or an authoritative figure (e.g. police officer) in order to affect a witness’ subsequent crime-related judg[ ]ments.”[106] In one study, after witnesses made incorrect identifications, they were told either that their co-witness made the same or a different identification.[107] Not surprisingly, confidence rose among the witnesses that were told that their co-witness had agreed with them and fell among those told that co-witnesses had disagreed.[108]
Though law enforcement officials may not be able to completely insulate witnesses from this system variable, police did not even attempt to guard against it here. The witnesses who identified Dennis viewed the lineup in the same room and at the same time. Detective Wynn’s instruction to the witnesses not to react or show emotion during the lineup reduces the risk of feedback, but this instruction did not eliminate it. Therefore, the risk that the witnesses’ reactions may have influenced the results of the lineup cannot be discounted, and the jurors should have been instructed about this possibility.
Furthermore, the record of Bertha’s photo array identification establishes the existence of at least some officer-to-witness feedback. Detective Santiago asked Bertha to affirm his identification: “Can you be sure that photo #1 is the male that you saw get away from the girl and run at you with the gun after the gunshot?”[109] Only then did Bertha state he was “sure”[110] Dennis was the shooter as opposed to his initial statement that Dennis’ photo merely “look[ed] like”[111] the shooter.
I am not suggesting that Detective Santiago’s question ultimately negated Bertha’s ability to make an in-court identification. Nor am I suggesting that Detective Santiago intentionally tried to reinforce Bertha’s confidence in his identification or “prime” him for a subsequent in-court identification. I am, however, suggesting that the jury should have been informed of how Detective Santiago’s response to Bertha’s initial selection of Dennis’ photo may have affected the reliability of Bertha’s lineup identification and, as I next explain, his subsequent in-court identification as well.
5. Multiple viewings
Another crucial system variable — and one that was clearly present here — is the *328 opportunity to engage in multiple viewings of a suspect. Allowing a witness to view a suspect more than once during an investigation can have a powerful corrupting effect on that witness’ memory. It creates a risk that the witness will merely identify a suspect based on her past views of him rather than her memory of the relevant event. Meta-analysis has revealed that while fifteen percent of witnesses mistakenly identify an innocent person during the first viewing of a lineup, that percentage jumps to thirty-seven percent if the witness previously viewed that innocent person’s mug shot.[112] This phenomenon is known as “mug shot exposure.” Related studies have also shown the existence of “mug shot commitment.” This refers to the fact that once witnesses positively identify an innocent person from a mug shot, “a significant number” then “reaffirm! ] their false identification” in a later photo lineup.[113] This is true even when the real suspect is actually present in the lineup.[114] Nonetheless, multiple viewings seem to have no impact on the reliability of a lineup identification “when a picture of the suspect was not present in photographs examined earlier”[115] by the witness.
The incredible story of John White that I mentioned at the outset serves as a powerful example of the impact that multiple viewings can have on witness identifications. In 1979, John White was accused of breaking into the home of a seventy-four-year-old woman and then beating and raping her.[116] After the 'victim picked White out of a photo array, he was placed in a live lineup.[117] White was the only person repeated in both the photo array and live lineup. The victim identified White from that live lineup.[118] DNA analysis later revealed that the victim’s actual assailant was not White, but a man named James Parham. By the cruelest of ironies, Par-ham had actually been placed in the live lineup with White as a filler when the victim identified White as her assailant. Despite having an opportunity to view her real rapist in the lineup, the victim affirmed her initial selection of White. Her erroneous identification led to a life sentence for White, who served twenty-seven years before the DNA evidence exonerated him.[119]
A leading researcher offered the following explanation of White’s case:
The witness had already identified John White from a photographic lineup. And, John White was the only person who was in both the photographic lineup and the live lineup. Hence, what we have here, I believe, is a strong example of how a mistaken identification from one procedure (a photo lineup) is repeated in the next procedure (a live lineup) even though the real perpetrator is clearly present in the second procedure. Re *329 peating the same mistake can occur for several reasons. One possibility is that the initial mistaken identification changed the memory of the witness; in effect John White’s face “became” her memory of the attacker and the face of Parham no longer existed once she mistakenly identified John White. Another possibility is that she approached the live lineup with one goal in mind — find the man she had identified from the photos. Perhaps she never really looked at Parham because she quickly saw the man she identified from photos and did not need to look further.[120]
The witnesses who identified Dennis at trial were given not two, but three, opportunities to view Dennis. These multiple views could help explain why initially tentative guesses became certain identifications by the time the witnesses took the stand. The possibility cannot be ignored that the witnesses here, like the victims in White and Cotton’s cases, selected Dennis in the live lineup because they were looking for the man they had already identified from the photo arrays. The jurors should have been informed of the impact of multiple viewings so that they could have considered that effect in determining how much weight to afford the lineup identifications and/or the in-court identifications. Absent that information, the jurors were ill equipped to assess the possibility that Howard, Bertha, and Cameron’s lineup and in-court identifications of Dennis may have been based on prior viewings of his picture rather than their memories of the crime.
These system variables on the accuracy of eyewitness identifications highlight the importance of the procedures law enforcement officials use when soliciting identifications. As the Oregon Supreme Court has explained, “it is incumbent on courts and law enforcement personnel to treat eyewitness memory just as carefully as they would other forms of trace evidence, like DNA, bloodstains, or fingerprints, the evi-dentiary value of which can be impaired or destroyed by contamination. Like those forms of evidence, once contaminated, a witness’ original memory is very difficult to retrieve.”[121]
B. Estimator Variables
Estimator variables are the conditions present during memory formation or storage. They can also have a substantial impact on the reliability of eyewitness identifications.[122] Crucial estimator variables include, but are not limited to, the amount of stress on the observer, the presence of weapons, and visibility conditions. Unlike system variables, estimator variables are beyond the control of the criminal justice system. Nevertheless, asking jurors to consider eyewitness identifications without properly instructing them on the impact' that such estimator variables may have had erects yet another barrier to accurate evaluation of identifications.
1. Stress
First, high levels of stress at the time of memory formation can negatively impact a witness’ ability to accurately identify the perpetrator.[123] Stressful conditions impair *330 a witness’ ability to identify key characteristics of an individual’s face.[124] A meta-analysis of the effect of high stress on eyewitness identifications found that stress hampers both eyewitness recall and identification accuracy.[125]
A recent study examining the effects of stress on identifications at a U.S. Military mock prisoner-of-war camp illustrates this phenomenon.[126] In this study, 509 active-duty military personnel, with an average of 4.2 years in the service, underwent two types of interrogations.[127] After twelve hours of confinement, participants experienced either a high-stress interrogation involving real physical confrontation followed by a low-stress interrogation without physical confrontation, or vice versa.[128] The interrogations were separated by approximately four hours, and about half the participants received the high-stress interrogation first, while the other half experienced the low-stress interrogation first.[129] Both interrogations lasted about forty minutes.[130] Twenty-four hours after the interrogations, the participants were asked to identify their interrogators from live lineups, sequential photo arrays, or simultaneous photo arrays.[131] Across all identification procedures, subjects had far more difficulty accurately identifying their high-stress interrogators.[132] Sixty-two percent of subjects could identify their low-stress interrogators in live lineups, while only thirty percent of subjects could accurately identify their high-stress interrogators from such lineups.[133] Furthermore, fifty-six percent of subjects erroneously identified a person who was not their interrogator (false positive) during live lineups, while only thirty-eight percent of subjects did so for their low-stress interrogations.[134]
This study is particularly stunning when one considers that the subjects all had a prolonged and unobstructed opportunity to view their interrogators, and the interrogators were all within arm’s reach of their subjects. The subjects’ ability to see the faces of their interrogators was therefore exponentially better than the opportunity witnesses to most violent crimes have to see perpetrators. Their views were certainly better than those of Howard, Bertha, and Cameron. As the study’s authors explained,
[cjontrary to the popular conception that most people would never forget the face of a clearly seen individual who had physically confronted them and threatened them for more than 30 min[utes], ... [tjhese data provide robust evidence that eyewitness memory for persons encountered during events that are personally relevant, highly stressful, and realistic in nature may be subject to substantial error.[135]
*331 Notably, this study further found that memories formed during a stressful event are highly susceptible to modifications from misinformation received after the event. That has particular relevance here given the presence of the system variables described above.
Stress almost certainly affected all of the witnesses who saw Chedell Williams gunned down. The shooting undoubtedly caused Howard — the prosecution’s star witness — a significant amount of stress. Not only was she herself chased, but she also watched as the perpetrator grabbed her best friend and shot her at point-blank range. It is not surprising that multiple witnesses recalled hearing Howard screaming. Stress also likely affected Bertha’s ability to later make an accurate identification. He saw the shooter as the shooter rushed him, head on, pistol in hand. Jurors cannot properly assess eyewitness identification testimony where stress was present at memory formation unless this variable is explained to them.
2. Weapon Focus
The presence of weapons is a second, and related, estimator variable. The National Research Council has stated, “[research suggests that the presence of a weapon at the scene of a crime captures the visual attention of the witness and impedes the ability of the witness to attend to other important features of the visual scene, such as the face of the perpetrator.... The ensuing lack of memory of these other key features may impair recognition of a perpetrator in a subsequent lineup.”[136] In 1992, an analysis of weapon focus studies concluded that the presence of a weapon significantly reduced witnesses’ ability to recall their perpetrators.[137] A more recent study of the pertinent literature confirms that weapon presence has a consistently negative impact on both feature recall accuracy and identification accuracy.[138]
Here, the jury was never informed that visibility of the perpetrator’s gun may well have hampered the witnesses’ ability to observe and/or form an accurate memory of the assailant's face. Howard, Bertha, and Cameron all provided clear descriptions of the gun, revealing their focus on it. But the jury was never informed of how this powerful estimator variable may have affected them.
3. Memory Decay
The period between memory formation and memory recall is known as the “retention interval” and constitutes another important estimator variable. A meta-analysis of fifty-three facial memory studies found “that memory strength will be weaker at longer retention intervals than at briefer ones.”[139] Most of the studies analyzed in this meta-analysis examined retention intervals of less than one month, many of them less than one week. This meta-analysis also found agreement among experts that “the rate of memory loss for *332 an event is greatest right after an event and then levels off over time.”[140] Furthermore,
[t]he effect of the retention interval also is influenced by the strength and quality of the initial memory that is encoded, which, in turn, may be influenced by other estimator variables associated with witnessing the crime (such as the degree of visual attention) and viewing factors (such as distance, lighting, and exposure duration).[141]
The in-court identifications of Dennis were made nearly one year after the crime occurred — a very significant retention interval under the relevant studies. Research is hardly necessary to appreciate the difficulty of trying to accurately recall the details of this chaotic and traumatizing event— lasting only a matter of seconds — a year later. The jurors should have been informed of that difficulty and its possible impact on the accuracy of these identifications. They were not.
4. Exposure Duration, Distance, and Lighting
As one would expect, exposure duration, distance, and lighting affect the accuracy of eyewitness identifications.[142] The charge that was given here did alert the jurors to the impact of these factors on the accuracy of an identification.[143] However, as I explain in the following section, it did not adequately convey the impact these factors can have on in-court identifications.
C. The Dissent’s Dismissal of Estimator Variables
As the Majority recounts, nearly all of the eyewitnesses who mentioned the shooter’s height in their initial police interviews described him as between 5'8" and 5'10".[144] The witnesses also described the shooter as having a dark complexion and weighing about 170 to 190 pounds. James Dennis is 5'5" tall and weighed between 125 and 182 pounds at the time of trial.
*333 The Dissent dismisses and tries to rationalize away this considerable size discrepancy. In an attempt to reinforce the reliability of the three witnesses, the Dissent relies on research that concludes eyewitnesses tend to underestimate the height and weight of taller and heavier targets and overestimate the height and weight of shorter and lighter targets.[145] The Dissent’s use of that research is cruelly ironic. The finding of those studies was not that we should disregard eyewitness inaccuracy, as the Dissent’s citation implies. Those researchers found just the opposite. The studies discovered that eyewitness identifications are frequently unreliable,[146] As two of the researchers explained, “[t]he width and range of subjects’ errors for the targets’ height and weight in this study showed clearly that some subjects experience great difficulty in accurately judging another individual’s physical characteristics.”[147]
The Dissent also focuses on the strength of three estimator variables. The Dissent reminds us that “the visual conditions were excellent,”[148] the witnesses saw the shooter at “close range,”[149] and none of the identifications were cross-racial.[150] This is not only misleading, it also ignores many other system and estimator variables that were at least as important (if not more important) than the ones the Dissent focuses upon.
I agree that the lighting was good. However, the lighting here was likely no better than that in the rooms where the military personnel who failed to recognize the faces of their interrogators were questioned under stressful conditions.[151] The witnesses here were in close proximity to the shooter. However, they were not as close as Jennifer Thompson was to Ronald Cotton or John White’s accuser was to him. Moreover, these witnesses only had a matter of seconds to view the perpetrators. Howard saw the shooter as he rushed towards her, Cameron in the seconds the crime occurred, and Bertha as the shooter ran past him. All of the witnesses’ views occurred under highly stressful circumstances and their focus appears to have been as much on the gun in the shooter’s hand as on the shooter’s face. As I will explain in greater detail below, the charge that the jurors received did not focus their attention on any of those considerations.
The lack of blinding, thé presence of officer feedback, the fact that the record suggests that the witnesses thought they had to select someone from the photo arrays, the multiple viewings of Dennis, and the witnesses’ viewing of the live lineup in the same room, all suggest that the identifications may have been corrupted by cues from law enforcement and/or other witnesses.
*334 We would be justifiably skeptical of any clinical trial where the researcher knew which sample was a placebo or who received the placebo. Yet, we do not think twice about allowing someone to be convicted of a crime and sentenced to death on the basis of identification procedures where the investigator presenting the photo array or lineup is fully aware of who the suspect is. The witnesses who identified Dennis at trial had not one, but three opportunities to view Dennis. And none of the procedures included any level of blinding. Nothing in this record suggests that anyone other than Dennis was present in both the photo array and lineup. Yet, the jury was not made aware of the potential importance of any of these considerations. That should sound a note of caution in assessing the reliability of these identifications.
Finally, we should not ignore the fact that the majority of the witnesses that police interviewed after the crime were unable to identify Dennis as the shooter. Jurors did not know that Joseph DiRienzo, Joseph DiRienzo, Jr., Clarence Verdell, and David LeRoy all were unable to identify Dennis from the photo array. Although Anthony Overstreet did identify Dennis from this array, he did not think Dennis was the shooter once he had an opportunity to view him in the lineup. Overstreet had expressed the most confidence in his ability to positively identify the shooter during the initial police interviews.[152] When the totality of circumstances is viewed in context, the evidence of Dennis’ guilt is not as uncompromising as the Dissent suggests.
Moreover, concerns about the reliability of these identifications should not be assuaged by evidence that was introduced in an attempt to corroborate the identification testimony. As the Majority explains, aside from eyewitness testimony, the Commonwealth presented testimony from Charles Thompson, who told detectives that he saw Dennis with a gun the night of the murder. Thompson identified an illustrative .32 chrome revolver (previously admitted as a Commonwealth exhibit) as being similar to the one he saw in Dennis’s possession. As the Majority notes, Thompson had an open drug-possession charge at the time of trial, but testified that he was not expecting help from the Commonwealth in exchange for his testimony. Years after trial, Thompson recanted his testimony, averring that he had never seen Dennis with a gun and that his testimony at trial was false.
I realize, of course, that it can be argued that Thompson’s recantation is not necessarily relevant to the force of the eyewitness identifications because it happened after trial. However, his testimony clearly corroborated the identification evidence, and it underscores the dangers of the inadequate identification instructions. The fact that the jurors were not given a sufficient basis to assess the identifications of Dennis severely undermined the potential force of Dennis’ alibi testimony. Why would jurors believe such testimony (especially since it was offered by his father) when three neutral witnesses identified Dennis as the shooter? Had the jurors been able to assess the identifications with an appropriate understanding of the variables I have discussed, Dennis’s alibi testimony may well *335 have had much greater force, and jurors would have been in a better position to weigh Dennis’ alibi against Thompson’s testimony that appeared to corroborate the three eyewitnesses. That is particularly true when we factor in the evidence of the Cason receipt that the Majority explains.[153] The Cason receipt could have further bolstered Dennis’ alibi testimony and raised a reasonable doubt about the accuracy of the eyewitness identifications.
IV. Manson v. Brathwaite and its Progeny
In 1977, the Supreme Court established a basic framework for determining whether admission of a particular identification violates a defendant’s Fourteenth Amendment right to due process in Manson v. Brathwaite.[154] Under the Manson test, a court must first assess whether the eyewitness identification procedure at issue was, under the “totality of the circumstances,” unnecessarily suggestive.[155] If the identification procedure was not unnecessarily suggestive, the inquiry ends. However, if it was unduly suggestive, a court must considers five factors to determine whether the resulting identification is nonetheless reliable. Those factors, drawn from the Supreme Court’s prior decision in Neil v. Biggers,[156] are: (1) “the opportunity of the witness to view the criminal at the time of the crime,” (2) “the witness’ degree of attention,” (3) “the accuracy of the witness’ prior description of the criminal,” (4) “the level of certainty demonstrated by the witness at the confrontation,” and (5) “the length of time between the crime and the confrontation.”[157] These factors are weighed against “the corrupting effect of the suggestive identification itself.”[158] Manson emphasizes that “reliability is the linchpin in determining the admissibility of identification testimony.”[159]
Since Manson, more than 2,000 scientific studies have been conducted on the reliability of eyewitness identifications.[160] As I have explained, we now understand that even seemingly neutral identification procedures can lead to unreliable results due to a myriad of subtle variables. We also now know that a witness’ subjective confidence in the accuracy of her identification has limited correlation to the reliability of her identification. As the National Research Council emphasized in its recent report on eyewitness identifications, the Manson test “treats factors such as the confidence of a witness as independent markers of reliability when, in fact, it is now well established that confidence judgments may vary over time and can be powerfully swayed by many factors.”[161]
The Supreme Court recently reaffirmed the approach laid out in Manson in Perry v. New Hampshire.[162] There, an eyewitness saw a man break into a car, called the police, and then told the responding officer *336 that a man standing in the building’s parking lot was the perpetrator.[163] That man was then arrested and convicted in state court. On appeal to the Supreme Court, he argued that the highly suggestive nature of the identification process entitled him to a suppression hearing prior to trial in order to determine the admissibility of the identification.[164] The Supreme Court rejected this argument. It held that the Due Process Clause of the Fourteenth Amendment only requires such a hearing when law enforcement arranged the unnecessarily suggestive circumstances under which the identification was obtained.[165] The Court “linked the due process check, not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification.”[166]
In reaching this conclusion, the Court acknowledged the scientific research on eyewitness reliability.[167] It recognized the importance of this body of science and urged more robust jury instructions. As the Court explained, “[ejyewitness-specific jury instructions, which many federal and state courts have adopted, [] warn the jury to take care in appraising identification evidence.”[168] The Court also stressed the importance of evidentiary rules “to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact or potential for misleading the jury.”[169] Thus, instead of considering the relevant system and estimator variables “under the banner of due process,”[170] the Supreme Court advocated that courts incorporate the relevant scientific findings through other avenues, such as jury instructions and evidentiary rules.
Some state- courts have heeded Perry’s call and created new procedures and evi-dentiary frameworks that minimize the risks associated with erroneous eyewitness identifications. Most notably, in a unanimous decision, the Supreme Court of New Jersey re-wrote the state’s rules governing the admission of eyewitness identifications in State v. Henderson.[171] Prior to that decision, New Jersey courts relied on the Manson test to determine whether certain identifications were admissible.[172] Henderson, however, held that the Manson test did “not offer an adequate measure for reliability or sufficiently deter inappropriate police conduct.” The court also concluded that Manson “overstates the jury’s inherent ability to evaluate evidence *337 offered by eyewitnesses who honestly believe their testimony is accurate.”[173]
To remedy these problems, the court pioneered a two-part revision to the judicial procedures related to eyewitness identifications. First, the court changed the requirements related to pre-trial hearings on the admissibility of eyewitness identifications. After Henderson, a defendant can now obtain a pre-trial hearing if she can show “some evidence of suggestiveness that could lead to a mistaken identification.”[174] The court specified that this “evidence, in general, must be tied to a system — and not an estimator — variable.”[175] The trial court can end this hearing at any time “if it finds from the testimony that defendant’s threshold allegation of suggestiveness is groundless.”[176] But if the defendant’s claim is meritorious, the trial judge must weigh both system and estimator variables[177] to decide whether, under the “totality of the circumstances,” the defen *338 dant has “demonstrated a very substantial likelihood of irreparable misidentification.”[178] If the trial court concludes that the defendant has met this burden, the court must suppress the identification evidence.[179]
Second, the New Jersey Supreme Court directed the state judicial system to develop “enhanced jury charges on eyewitness identification for trial judges to use.”[180] As the court explained, “[w]e anticipate that identification evidence will continue to be admitted in the vast majority of cases. To help jurors weigh that evidence, they must be told about relevant factors and their effect on reliability.”[181]
Henderson also emphasized that the “factors that both judges and juries will consider are not etched in stone.”[182] Rather, “the scientific research underlying them will continue to evolve, as it has in the more than thirty years since Manson.”[183] Accordingly, the court clarified that its decision does not “limit trial courts from reviewing evolving, substantial, and generally accepted scientific research.”[184]
Finally, the New Jersey Supreme Court suggested that, where appropriate, trial courts consider giving instructions during the trial before eyewitness identification testimony is elicited. Such instructions would help inform juries, up front, of the problems that can arise from seemingly unequivocal courtroom identifications.[185]
After Henderson, in July 2012,[186] the New Jersey Supreme Court released its expanded set of jury instructions governing evaluation of identifications. These instructions explain that scientific research has shown eyewitness identifications can be unreliable, and they emphasize that eyewitness evidence “must be scrutinized carefully.”[187] To this end, the instructions identify a specific set of factors that jurors should consider when deciding whether eyewitness identification evidence is reliable, including estimator and system variables.[188] These instructions are consistent with the Supreme Court’s analysis in Perry and will better equip jurors to evaluate the reliability of eyewitness identifications.[189]
*339 The Supreme Court of Oregon has likewise reformed the state judicial system’s approach to eyewitness identifications. However, Oregon has taken a slightly different approach. In State v. Lawson,[190] the court addressed the reliability issue from an evidentiary standpoint as opposed to a due process one. Prior to Lawson, Oregon courts adhered to a rule under which trial courts could not consider whether an identification was unreliable until some evidence of suggestiveness was first introduced.[191] In rejecting that approach, the Oregon Supreme Court explained:
Such a requirement [ ] conflates eviden-tiary principles with due process concerns. A constitutional due process analysis might properly consider suggestiveness as a separate prerequisite to further inquiry because the Due Process Clause is not implicated absent some form of state action, such as the state’s use of a suggestive identification procedure. As a matter of state evidence law, however, there is no reason to hinder the analysis of eyewitness reliability with purposeless distinctions between suggestiveness and other sources of unreliability.... A trial court tasked with determining a constitutional claim must necessarily assume that the evidence is otherwise admissible; were it inadmissible on evidentiary grounds, the court would never reach the constitutional question. However, a trial court tasked with considering a question of evidentiary admissibility clearly cannot begin by assuming admissibility.[192]
Lawson then fashioned a new approach to examining eyewitness identifications from existing rules of evidence. Under this revised test, “when a criminal defendant files a pretrial motion to exclude eyewitness identification evidence, the state as the proponent of the eyewitness identification must establish all preliminary facts necessary to establish admissibility of the eyewitness evidence.”[193] If the challenged eyewitness evidence implicates the Oregon equivalents of Federal Rules of Evidence 602[194] and 701,[195] the state must prove that the eyewitness has personal knowledge of the matter on which she will testify, and *340 her identification “is both rationally based on [her] first-hand perceptions and helpful to the trier of fact.”[196] This flips the burdens in due process cases such as Manson and Henderson. Rather than the defendant proving that the identification at issue is unreliable, the state must first prove that the identification meets the evidentiary requirements of Rules 602 and 701.
If the state successfully shows that the identification evidence is admissible, the burden then shifts to the defendant to establish that “the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence.”[197] Thus, Oregon courts now rely on the state equivalent of Federal Rule of Evidence 403[198] to exclude unreliable eyewitness identifications that are otherwise admissible. If a trial court concludes that the defendant has made such a showing, “the trial court can either-exclude the identification, or fashion an appropriate intermediate remedy short of exclusion to cure the unfair prejudice or other dangers attending the use of that evidence.”[199]
State courts are not alone in their responses to the scientific research. Federal circuit courts of appeals have also acknowledged the unreliability of certain eyewitness testimony.[200] In United States v. Brownlee,[201] we recognized the importance of expert testimony in safeguarding against unreliable eyewitness identifications. There, we held that a district court properly admitted expert testimony concerning the effects of race, hair covering, weapons focus, and exposure on the identification accuracy of multiple witnesses.[202] We further held that the district court improperly excluded expert testimony comparing the show-up procedure used in that case (a procedure where law enforcement presents a single individual arguably fitting a witness’ description to that witness for identification) and other identification procedures and analyzing the suggestiveness of the show-up and its potential effect on the identifications. We also held that the district court improperly excluded expert testimony on confidence malleability, post-event suggestiveness, and confidence of accuracy.[203] In doing so, we joined the growing chorus in acknowledging that
The recent availability of post-conviction DNA tests demonstrate that there have been an overwhelming number of false convictions stemming from uninformed reliance on eyewitness misidentifica-tions.... In fact, mistaken eyewitness identifications are responsible for more wrongful convictions than all other causes combined. Eyewitness evidence presented from well-meaning and confident citizens is highly persuasive but, at the same time, is among the least reliable forms of evidence.[204]
*341 We then explained that expert testimony can play a crucial role in counteracting the falsely persuasive effect of unreliable eyewitness testimony.[205] As the Nationál Research Council has recognized, expert testimony on eyewitness identifications may hold certain advantages over jury instructions as a method to explain the relevant science to juries.[206] Expert witnesses: (1) “can explain scientific research in a more flexible manner, by presenting only the relevant research to the jury”; (2) are more “familiar with the research and can describe it in detail”; (3) “can convey the state of the research at the time of the trial”; (4) “can be cross-examined by the other side”; and (5) “can more clearly describe the limitations of the research.”[207] Therefore, expert testimony on eyewitness accuracy is a crucial tool for educating juries on the science surrounding identifications.
It is against this backdrop that we must assess the jurors’ acceptance of the three eyewitness identifications of Dennis and the adequacy of the charge that guided their deliberations.
V. The Jury Charge
In Watkins v. Sowders, Justice Brennan wrote: “Surely jury instructions can ordinarily no more cure the erroneous admission of powerful identification evidence than they can cure the erroneous admission of a confession.”[208] Although Justice Brennan was referring to the admissibility of certain eyewitness identifications rather than their reliability, his caution underscores the limited utility of a bare bones jury instruction that does not properly inform jurors about the many factors that can undermine courtroom identifications. This is particularly so given the powerful countervailing effect of jurors’ predisposition to believe eyewitness testimony.
Studies have documented that jurors tend to misunderstand how memory works and often believe it to be much more reliable and less susceptible to outside influence than it actually is.[209] One survey of 1,000 potential jurors in Washington, D.C. found that almost two-thirds of the respondents thought the statement “I never forget a face” applied “very well” or “fairly well” to them[210] Another thirty-seven percent thought the presence of a weapon would enhance the witness’ reliability, while thirty-three percent either believed that the weapon would have no effect or were unsure what effect the weapon would have.[211] Finally, thirty-nine percent of respondents believed that when an event is violent, it makes a witness’ memory for details more reliable, while thirty-three percent responded either that this would have no effect or that they were unsure of the effect violence during the commission of the crime would have.[212] The studies I have discussed show how wrong these beliefs are. There is no reason to believe the jurors who convicted Dennis were any more enlightened about memory formation and recall than the respondents in these studies.
*342 Yet, the jurors who convicted James Dennis were only provided with a “plain vanilla” instruction. They had no knowledge of the potential distortion that can be caused by the factors discussed here. The trial court’s entire jury instruction regarding how the jurors should evaluate the eyewitness identifications was as follows:
There have been several Commonwealth identification witnesses.... However, a mistake can be made in identifying a person even by a witness attempting to be truthful.
Where the opportunity for positive identification is good and the witness is positive in his or her identification and his or her identification is not weakened by prior failure to identify but remains, even after cross-examination, positive and unqualified, the testimony as to identification need not be received with caution and can be treated as a statement of fact.
On the other hand, where a witness is not in a position to clearly observe the assailant or is not positive, as to identify, or his or her positive statements as to identity are weakened by qualification or by inconsistencies or by failure to identify the defendant on one or more prior occasions, then the testimony as to identification must be received with caution. You have heard the testimony in this case to the effect, and I leave it to your judgment and for your determination, but my recollection is that there were some prior identifications that were less than unqualified or positive. I think that’s been gone over at length by counsel. Under those circumstances, you should receive the testimony with caution. But it’s for you to determine whether or not this is so, you decide whether the testimony was weakened and what the evidence was.
If, according to these rules, you decide that caution is required in determining whether or not to accept the testimony of the identifying witnesses, then you must take into consideration the following matters: A, whether the testimony of the identification witness is generally believable; B, whether his or her opportunity to observe was sufficient to allow him or her to make an accurate identification; C, how the identification was arrived at; D, all of the circumstances indicating whether or not the identification was accurate; and E, whether the identification testimony is supported by other evidence. And you must conclude that it is so supported before you can accept it as being accurate.
My advice to you is this. In this case, my recollection, that’s why I’m not being so emphatic, my recollection is that one of the witnesses said, “I think[,]”[] another witness, for example, said, at a certain time, “I can’t be sure.” Witnesses who testified that way, their testimony as to identification should be received with 'caution and you should follow the rules that I’ve given you.[213]
Absent from this instruction is any explanation of the relevant system or estimator variables that so crucially impact the reliability of witness identifications. The caution the trial court urged is of precious little help given that omission. Jurors need to be informed of the applicable variables before they will be in a position to exercise the caution that this instruction urged. Without those detailed instructions, jurors simply are in no position to fully appreciate that “[t]he witness’ recollection of [a] stranger can be distorted easily by the circumstances or by later actions of the police.”
*343 Moreover, as should be evident from my discussion, the italicized text instructing the jurors that they need not be cautious about accepting the identification of a witness who appears certain of her identification and had a good opportunity to observe the crime is extraordinarily dangerous. Contrary to the court’s instruction, that testimony cannot be accepted as fact. Social science aside, one need only consider the professed certainty of the accusers of Ronald Cotton and John White to understand just how problematic such a charge is. We again face a familiar and problematic reality: How ill-equipped these jurors were to assess the accuracy of the three eyewitnesses who pointed to Dennis and said “that’s the one.”
VI. Conclusion: Un-Ringing the Bell
In 1977, Justice Marshall emphasized that “ ‘the vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.’ ”[214] They are known far better today. As Justice Marshall continued: “It is, of course, impossible to control one source of such errors[ — ]the faulty perceptions and unreliable memories of witnesses[ — jexcept through vigorously contested trials conducted by diligent counsel and judges.”[215] Given the quantity and quality of research that has been conducted since Justice Marshall wrote those words, we judges must do a better job of educating ourselves and jurors about the dynamics of eyewitness identifications. Although no system so dependent on the limits of human abilities will ever be able to totally eliminate the problems endemic in eyewitness testimony, the integrity of the criminal justice system demands that we do better.
“[Jjurors seldom enter a courtroom with the knowledge that eyewitness identifications are unreliable. Thus, while science has firmly established the inherent unreliability of human perception and memory, this reality is outside the jury’s common knowledge and often contradicts jurors’ ‘commonsense’ understandings.”[216] Therefore, thorough and appropriately focused jury instructions that reflect the scientific findings are critical to allowing jurors to discharge their solemn obligation to assess evidence.[217] Such instructions will also encourage police to use more neutral procedures in investigating crimes. If law enforcement officials know that juries will be informed about best practices for obtaining identifications, police will have a very strong incentive to adopt protocols consistent with those best practices. As the National Research Council has explained, *344 such instructions therefore “create an incentive for agencies to adopt written eyewitness identification procedures and to document the identifications themselves.”[218]
It is difficult to un-ring the bell that an unreliable eyewitness identification tolls. Therefore, in the first instance, it is law enforcement — not the courts — that can best ensure against an undue risk of convicting the innocent. However, robust jury instructions can minimize the dangers associated with inaccurate eyewitness identifications. In this case, had the jury been appropriately informed of the problems associated with the procedures used to solicit the identifications, as well as the numerous estimator variables that could have affected them, the jurors may well have concluded that James Dennis was not the one who shot Chedell Williams.

. Dissent at 357 (Fisher, J.).

. Id.

. State v. Henderson, 208 N.J. 208, 27 A.3d 872, 892 (2011), holding modified by State v. Chen, 208 N.J. 307, 27 A.3d 930 (2011); Charles A. Morgan III et al., Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress, 27 Int’l J.L. & Psychiatry 265, 265 (2004).

. The Innocence Project, Reevaluating Lineups: Why Witnesses Make Mistakes and How to Reduce the Chance of a Misidentification 3 (2009), available at http://www.innocence project.org/wp-content/uploads/2016/05/ eyewitness_id_report-5.pdf; see also Brandon L. Garrett, Convicting the Innocent: Where Criminal Prosecutions Go Wrong 8-9, 279 (2011) (finding same in 190 of 250 DNA exoneration cases); Brief for Am. Psychol. Ass'n as Amicus Curiae Supporting Petitioner at 14-15, Perry v. New Hampshire, 132 S.Ct. 716 (2012) ("[Sjtudies have consistently found that the rate of inaccurate identifications is roughly 33 percent.”)..

. 60 • Minutes, Eyewitness: How Accurate is Visual Memory?, CBS News, Mar. 6, 2009, http://www.cbsnews.com/news/eyewitness-how-accurate-is-visual-memory.

. Id.

. Committee on Scientific Approaches to Understanding and Maximizing the Validity and Reliability of Eyewitness Identification in Law Enforcement and the Courts, Committee on Science, Technology, and Law, Committee on Law and Justice, Division of Behavioral and Social Sciences and Education, National Research Council, Identifying the Culprit: Assessing Eyewitness Identification 10 (2014).

. Id.

. Id.

. Id.

. Id.-, 60 Minutes, supra.

. National Research Council, Identifying the Culprit, supra, at 10.

.' Id.

. Jules Epstein, Eyewitnesses and Erroneous Convictions: An American Conundrum, in Controversies in Innocence Cases in America 41, 43 (Sarah Lucy Cooper ed., 2014).

. National Research Council, Identifying the Culprit, supra, at 10.

. Id.

. Epstein, supra, at 43.

. National Research Council, Identifying the Culprit, supra, at 10.

. 60 Minutes, supra.

. National Research Council, Identifying the Culprit, supra, at 10.

. Epstein, supra, at 43 (citation omitted).

. The Innocence Project, Reevaluating Lineups, supra, at 3.

. National Research Council, Identifying the Culprit, supra, at 11.

. National Research Council, Identifying the Culprit, supra, at 22 (citing Int’l Ass’n of Chiefs of Police, National Summit on Wrongful Convictions: Building a Systemic Approach to Prevent Wrongful Convictions (2013)).

. State v. Henderson, 208 N.J. 208, 27 A.3d 872, 879 (2011), holding modified by State v. Chen, 208 N.J. 307, 27 A.3d 930 (2011).

. J.A. 1495.

. J.A. 1496.

. J.A. 1494.

. Id.

. Id.

. J.A. 1493.

. Id.

. Id.

. J.A. 165.

. Id.

. J.A. 161.

. J.A. 1548.

. J.A. 1537.

. J.A. 1548.

. J.A. 1555.

. J.A. 1556.

. Id.

. J.A. 1565.

. Id.

. J.A. 1566.

. See infra Part III.A.4.

. J.A. 1576.

. J.A. 1581.

. See infra Part III.A.4.

. J.A. 226-27.

. J.A. 228-29.

. Felix Frankfurter, The Case of Sacco and Vanzetti: A Critical Analysis for Lawyers and Laymen 30 (Universal Library ed., 1962).

. Edwin M. Borchard, Convicting the Innocent; Sixty-Five Actual Errors of Criminal Justice (1932).

. 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

. Id. at 228, 87 S.Ct. 1926.

.See, e.g., Gary L. Wells, Nancy K. Steblay, & Jennifer E. Dysart, Double-Blind Photo Lineups Using Actual Eyewitnesses: An Experimental Test of a Sequential Versus Simultaneous Lineup Procedure, 39 L. & Hum. Behav. 1, 1 (2015); Laura Smalarz & Gary L. Wells, Contamination of Eyewitness Self-Reports and the Mistaken-Identification Problem, 24 Current Directions Psychol. 120, 120 (2015); Brian L. Cutler & Steven D. Penrod, Mistaken Identification: The Eyewitness, Psychology, and the Law (1995); Eyewitness Testimony: Psychological Perspectives (Gary L. Wells & Elizabeth A. Loftus eds., 1984).

. National Research Council, Identifying the Culprit, supra, at 14-15.

. See id. at 16, 72, 76.

. See State v. Henderson, 208 N.J. 208, 27 A.3d 872, 896-97 (2011), holding modified by State v. Chen, 208 N.J. 307, 27 A.3d 930 (2011); National Research Council, Identifying the Culprit, supra, at 24-25, 26.

. National Research Council, Identifying the Culprit, supra, at 25.

. Id. at 25.

. See Henderson, 27 A.3d at 896-97; National Research Council, Identifying the Culprit, supra, at 24-25, 26.

. Henderson, 27 A.3d at 896 (internal quotation marks omitted).

. Robert Rosenthal & Donald B. Rubin, Interpersonal Expectancy Effects: The First 345 Studies, 3 Behav. & Brain Sci. 377, 377 (1978).

. Id.

. Henderson, 27 A.3d at 896 (citing Ryann M. Haw & Ronald P. Fisher, Effects of Administrator-Witness Contact on Eyewitness Identification Accuracy, 89 J. Applied Psychol. 1106, 1107 (2004) and Steven E. Clark, Tanya E. Marshall, & Robert Rosenthal, Lineup Administrator Influences on Eyewitness Identification Decisions, 15 J. Experimental Psychol.: Applied 63, 66-73 (2009)).

. Linda Geddes, Fallible DNA Evidence Can Mean Prison or Freedom, 2773 The New Scientist: Special Report 1, 5 (2010).

. Id.

. Id.

. Id.

. Id.

. Id.

. Id.

. Id. at 6 (internal quotation marks omitted).

. 388 U.S. 218, 236-37, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

. Id. at 235, 87 S.Ct. 1926 (internal alterations, quotation marks, and citation omitted).

. Id.

. See 60 Minutes, supra.

. Wade, 388 U.S. at 235, 87 S.Ct. 1926.

. Id.

. State v. Henderson, 208 N.J. 208, 27 A.3d 872, 897 (2011), holding modified by State v. Chen, 208 N.J. 307, 27 A.3d 930 (2011).

. See Steven E. Clark, A Re-examination of the Effects of Biased Lineup Instructions in Eyewitness Identification, 29 Law & Hum. Behav. 395, 418-20 (2005); Nancy M. Steblay, Social Influence in Eyewitness Recall: A Meta-Analytic Review of Lineup Instruction Effects, 21 Law & Hum. Behav. 283, 285-86, 294 (1997).

. See Roy S. Malpass & Patricia G. Devine, Eyewitness Identification: Lineup Instructions and the Absence of the Offender, 66 J. Applied Psychol. 482, 485 (1981).

. See Clark, Effects of Biased Lineup Instructions, supra, at 421; Steblay, Social Influence in Eyewitness Recall, supra, at 284.

. J.A. 1537 (emphasis added).

. J.A. 1548 (emphasis added).

. J.A. 1555 (emphasis added).

. See Roy S. Malpass, Colin G. Tredoux, & Dawn McQuiston-Surrett, Lineup Construction and Lineup Fairness, in 2 The Handbook of Eyewitnesses Psychology 155, 156-58 (2007).

. State v. Henderson, 208 N.J. 208, 27 A.3d 872, 898 (2011), holding modified by State v. Chen, 208 N.J. 307, 27 A.3d 930 (2011) (citing David F. Ross et al., When Accurate and Inaccurate Eyewitnesses Look the Same: A Limitation of the ‘Pop-Out’ Effect and the 10-to 12-Second Rule, 21 Applied Cognitive Psychol. 677, 687 (2007) and Gary L. Wells & Amy L. Bradfield, Measuring the Goodness of Lineups: Parameter Estimation, Question Effects, and Limits to the Mock Witness Paradigm, 13 Applied Cognitive Psychol. S27, S30 (1999)).

.Compare Steven E. Clark & Jennifer L. Tunnicliff, Selecting Lineup Foils in Eyewitness Identification Experiments: Experimental Control and Real-World Simulation, 25 L. & Hum. Behav. 199, 212 (2001), and Gary L. Wells, Sheila M. Rydell, & Eric P. Seelau, The Selection of Distractors for Eyewitness Lineups, 78 J. Applied Psychol. 835, 842 (1993), with Stephen Darling, Tim Valentine, & Ami-na Memon, Selection of Lineup Foils in Operational Contexts, 22 Applied Cognitive Psychol. 159, 165-67 (2008).

. See Nat’l Inst, of Justice, U.S. Dep't of Justice, Eyewitness Evidence: A Guide for Law Enforcement 29 (1999).

. Henderson, 27 A.3d at 898 (internal quotation marks omitted).

. National Research Council, Identifying the Culprit, supra, at 91 (citing Steven. E. Clark, Tanya E. Marshall, & Robert Rosenthal, Lineup Administrator Influences on Eyewitness Identification Decisions, 15 J. of Experimental Psychol.: Applied 63 (2009)).

. See Elizabeth F. Loftus, Leading Questions and the Eyewitness Report, 7 Cognitive Psy-chol. 560, 566 (1975).

. Id.

. Id.

. Id.

. Id.

. Amy B. Douglass & Nancy M. Steblay, Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-identification Feedback Effect, 20 Applied Cognitive Psychol. 859, 863 (2006).

. Id. at 864-65; see also Gary L. Wells & Amy L. Bradfield, "Good, You Identified the SuspectFeedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience, 83 J. Applied Psychol. 360 (1998).

. See Gary L. Wells, Elizabeth A. Olson, & Steve D. Charman, Distorted Retrospective Eyewitness Reports as Functions of Feedback and Delay, 9 J. Experimental Psychol.: Applied 42, 49-50 (2003).

. See Jeffrey S. Neuschatz et al., The Effects of Post-Identification Feedback and Age on Retrospective Eyewitness Memory, 19 Applied Cognitive Psychol. 435, 449 (2005).

.See, e.g., Rachel Zajac & Nicola Henderson, Don’t It Make My Brown Eyes Blue: Co-Witness Misinformation About a Target’s Appearance Can Impair Target-Absent Line-up Performance, 17 Memory 266, 275 (2009) ("[Pjarticipants who were [wrongly] told by the [co-witness] that the accomplice had blue eyes were significantly more likely than control participants to provide this information when asked to give a verbal descrip- • tion.”); Lorraine Hope et al., "With a Little Help fi'om My Friends ... ”: The Role of Co-Witness Relationship in Susceptibility to Misinformation, 127 Acta Psychologica 476, 481 (2008) (noting that all participants “were susceptible to misinformation from their co-witness and, as a consequence, produced less accurate recall accounts than participants who did not interact with another witness”); Helen M. Paterson & Richard I. Kemp, Comparing Methods of Encountering Post-Event Information: The Power of Co-Witness Suggestion, 20 Applied Cognitive Psychol. 1083, *327 1083 (2006) (“Results suggest that co-witness information had a particularly strong influence on eyewitness memory, whether encountered through co-witness discussion or indirectly through a third party.”); John S. Shaw III, Sena Garven, & James M. Wood, Co-Witness Information Can Have Immediate Effects on Eyewitness Memory Reports, 21 Law & Hum. Behav. 503, 503, 516 (1997) ("[W]hen participants received incorrect information about a co-witness’s response, they were significantly more likely to give that incorrect response than if they received no cohvitness information.”); C.A. Elizabeth Luus & Gary L. Wells, The Malleability of Eyewitness Confidence: Co-Witness and Perseverance Effects, 79 J. Applied Psychol. 714, 717-18 (1994).

. Elin M. Skagerberg, Co-Witness Feedback in Line-ups, 21 Applied Cognitive Psychol. 489, 494 (2007).

. Luus & Wells, The Malleability of Eyewitness Confidence, supra, at 717-18.

. Id.-, see also Skagerberg, supra, at 494-95 (showing similar results).

. J.A. 1556.

. Id.

. J.A. 1555.

. Kenneth A. Deffenbacher, Brian H. Born-stein, & Steven D. Penrod, Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference, 30 L. & Hum. Behav. 287, 299 (2006).

. See Gunter Koehnken, Roy S. Malpass, Michael, S. Wogalter, Forensic Applications of Line-Up Research, in Psychological Issues in Eyewitness Identification 205, 219 (Siegfried L. Sporer, Roy S. Malpass, Gunter Koehnken eds., 1996).

. Id.

. Id. at 218. However, as noted earlier, Dennis’ picture was presented in photo arrays that witnesses saw prior to viewing the lineup.

. The Innocence Project, John Jerome White, http://www.innocenceproject.org/cases/ john-jerome-white/ (last visited July 5, 2016).

. Id.

. Id.

. Id.

. Gary Wells, The Mistaken Identification of John Jerome White, https://public.psych. iastate.edu/glwells/The_Misidentification_of_ John_White.pdf (last visited July 6, 2016).

. State v. Lawson, 352 Or. 724, 291 P.3d 673, 689 (2012).

. See State v. Henderson, 208 N.J. 208, 27 A.3d 872, 895 (2011), holding modified by State v. Chen, 208 N.J. 307, 27 A.3d 930 (2011); National Research Council, Identifying the Culprit, supra, at 1, 72, 92-93.

. See Charles A. Morgan III et al., Accuracy of Eyewitness Identification Is Significantly Associated with Performance on a Standardized Test of Face Recognition, 30 Int’l J.L. & Psychiatry 213 (2007); Kenneth A. Deffen-bacher et al., A Meta-Analytic Review of the *330 Effects of High Stress on Eyewitness Memory, 28 L. & Hum. Behav. 687 (2004); Morgan et al., Accuracy of Eyewitness Memory, supra.

. See Charles A. Morgan III et al., Misinformation Can Influence Memory for Recently Experienced, Highly Stressful Events, 36 Int’l J.L. & Psychiatry 11, 15 (2013).

. Deffenbacher et al., Effects of High Stress, supra, at 699.

. Morgan et al., Accuracy of Eyewitness Memory, supra, at 266.

. Id. at 267-68.

. Id. at 268.

. Id.

. Id.

. Id. at 269-70.

. Id. at 272.

. Id.

. Id.

. Id. at 274.

. National Research Council, Identifying the Culprit, supra, at 93.

. Nancy K. Steblay, A Meta-analytic Review of the Weapon Focus Effect, 16 L. & Hum. Behav. 413, 415-17 (1992).

. Jonathan M. Fawcett et ah, Of Guns and Geese: A Meta-Analytic Review of the 'Weapon Focus’ Literature, Psychol., Crime & L. 1, 22 (2011).

. Kenneth A. Deffenbacher et al., Forget- ' ting the Once-Seen Face: Estimating the Strength of an Eyewitness’s Memory Representation, 14 J. Experimental Psychol.: Applied 139, 142 (2008); see also Carol Krafka & Steven Penrod, Reinstatement of Context in a Field Experiment on Eyewitness Identification, 49 J. Personality & Soc. Psychol. 58, 65 (1985) (finding a substantial increase in the misidentification rate in target-absent arrays from two to twenty-four hours after event).

. Deffenbacher et al., Forgetting the Once-Seen Face, supra, at 143.

. National Research Council, Identifying the Culprit, supra, at 99.

. Brian H. Bornstein et al., Effects of Expo- ■ sure Time and Cognitive Operations on Facial Identification Accuracy: A Meta-Analysis of Two Variables Associated with Initial Memory Strength, 18 Psychol., Crime & L. 473 (2012) (meta-analysis of the effect of exposure duration on facial identification accuracy); R.C.L. Lindsay et al., How Variations in Distance Affect Eyewitness Reports and Identification Accuracy, 32 Law & Hum. Behav. 526 (2008) (study of the effect of distance on identification accuracy).

. Race-bias — referring to the relative races of the witness and perpetrator — is another crucial estimator variable. Although this variable does not raise concerns here because the three eyewitnesses and the perpetrator were all Black, it is nevertheless worth noting because it again shows the extent to which circumstances (other than opportunity to observe) can greatly impact the reliability of an eyewitness identification. Research has thoroughly documented a phenomenon known as “own-race bias’’ wherein people more accurately identify faces within their own race as compared to those of members of a different racial group. See National Research Council, Identifying the Culprit, supra, at 96; Roy S. Malpass & Jerome Kravitz, Recognition for Faces of Own and Other Race, 13 J. Personality & Soc. Psychol. 330 (1969). The Innocence Project analyzed 297 DNA exonerations and found that a cross-racial misidentification occurred in forty-two percent of the cases in which an erroneous eyewitness identification was made. Edwin Grimsley, What Wrongful Convictions Teach Us about Racial Inequality, The Innocence Project (Sept. 26, 2012), http:// www.innocenceproject.org/Content/What_ WrongfuLConvictions_Teach_Us_About_ RaciaLInequality .php.

.In fact, one eyewitness — Joseph DiRienzo Jr. — described the shooter's height in terms of his own height: “about my height, about 5'9"." J.A. 1649.

. Dissent at 358 (Fisher, J.) (citing Christian A. Meissner, Siegfried L. Sporer, & Jonathan W. Schooler, Person Descriptions as Eyewitness Evidence, in 2 Handbook of Eyewitness Psychology 3, 8 (Rod C.L. Lindsay et al. eds., 2007) and Rhona H. Flin & John W. Shepherd, Tall Stories: Eyewitnesses’ Ability to Estimate Height and Weight Characteristics, 5 Hum. Learning 29, 34 (1986)).

. Meissner, Sporer, & Schooler, Person Descriptions as Eyewitness Evidence, supra, at 8 (citing the Flin and Shepherd study); Flin & Shepherd, Tall Stories, supra, at 36.

. Flin & Shepherd, Tall Stories, supra, at 36.

. Dissent at 357 (Fisher, J.).

. Id.

. Id. at 358 (citing Arizona v. Youngblood, 488 U.S. 51, 72 n.8, 109 S.Ct. 333, 102 L.Ed.2d 281).

. Morgan et al., Accuracy of Eyewitness Memory, supra, at 268.

. The fact that Overstreet and other non-identifying witnesses could theoretically have been called by defense counsel is no answer. No defense attorney in her right mind would put such witnesses on the stand, knowing that the witnesses had seen photographs of the defendant and would know the person sitting at counsel table was the person the police had arrested for the crime. A criminal justice system seeking fairness and justice should not countenance the creation of such an absurd dilemma.

. See Maj. Op. at 272-73, 274-75, 275-76.

. 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

. Id. at 106, 97 S.Ct. 2243 (internal quotation marks omitted).

. 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

. Id. at 199-200, 93 S.Ct. 375; Manson, 432 U.S. at 114, 97 S.Ct. 2243.

. Manson, 432 U.S. at 114, 97 S.Ct. 2243.

. Id.

. State v. Henderson, 208 N.J. 208, 27 A.3d 872, 892 (2011), holding modified by State v. Chen, 208 N.J. 307, 27 A.3d 930 (2011); Morgan et al., Accuracy of Eyewitness Memory, supra, at 265.

. National Research Council, Identifying the Culprit, supra, at 6.

. -U.S.-, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012).

. Id. at 721-22.

. Id. at 722-23.

. Id. at 730.

. Id. at 726 (emphasis added).

. Id. at 727 ("As one of Perry’s amici points out, many other factors bear on "the likelihood of misidentification,” — for example, the passage of time between exposure to and identification of the defendant, whether the witness was under stress when he first encountered the suspect, how much time the witness had to observe the suspect, how far the witness was from the suspect, whether the suspect carried a weapon, and the race of the suspect and the witness.” (internal citation omitted)).

. Id. at 728-29 (internal footnote omitted).

. Id. at 729.

. Id. at 727 ("To embrace Perry's view would thus entail a vast enlargement of the reach of due process as a constraint on the admission of evidence.”).

. 208 N.J. 208, 27 A.3d 872 (2011), holding modified by State v. Chen, 208 N.J. 307, 27 A.3d 930 (2011).

. See id. at 918; State v. Madison, 109 N.J. 223, 536 A.2d 254, 258-59 (1988) holding modified by State v. Henderson, 208 N.J. 208, 27 A.3d 872 (2011).

. Henderson, 27 A.3d at 878.

. Id. at 920.

. Id. The New Jersey Supreme Court instructed courts to consider the following non-exhaustive list of system variables when deciding whether to hold a pre-trial hearing:
1. Blind Administration. Was the lineup procedure performed double-blind? If double-blind testing was impractical, did the police use a technique like the "envelope method” described above, to ensure that the administrator had no knowledge of where the suspect appeared in the photo array or lineup?
2. Pre-identification Instructions. Did the administrator provide neutral, pre-identifi-cation instructions warning that the suspect may not be present in the lineup and that the witness should not feel compelled to make an identification?
3. Lineup Construction. Did the array or lineup contain only one suspect embedded among at least five innocent fillers? Did the suspect stand out from other members of the lineup?
4. Feedback. Did the witness receive any information or feedback, about the suspect or the crime, before, during, or after the identification procedure?
5. Recording Confidence. Did the administrator record the witness' statement of confidence immediately after the identification, before the possibility of any confirmatory feedback?
6. Multiple Viewings. Did the witness view the suspect more than once as part of multiple identification procedures? Did police use the same fillers more than once?
7. Showups. Did the police perform a show-up more than two hours after an event? Did the police warn the witness that the suspect may not be the perpetrator and that the witness should not feel compelled to make an identification?
8. Private Actors. Did law enforcement elicit from the eyewitness whether he or she had spoken with anyone about the identification and, if so, what was discussed?
9. Other Identifications Made. Did the eyewitness initially make no choice or choose a different suspect or filler?
Id. at 920-21.

. Id. at 920.

. The New Jersey Supreme Court told courts to consider the following, non-exhaustive list of estimator variables in assessing the reliability of an eyewitness identification:
1. Stress. Did the event involve a high level of stress?
2. Weapon focus. Was a visible weapon used during a crime of short duration?
3. Duration. How much time did the witness have to observe the event?
4. Distance and Lighting. How close were the witness and perpetrator? What were the lighting conditions at the time?
5. Witness Characteristics. Was the witness under the influence of alcohol or drugs? Was age a relevant factor under the circumstances of the case?
6. Characteristics of Perpetrator. Was the culprit wearing a disguise? Did the suspect have different facial features at the time of the identification?
7. Memory decay. How much time elapsed between the crime and the identification?
8. Race-bias. Does the case involve a cross-racial identification?
9. Opportunity to view the criminal at the time of the crime.
10. Degree of attention.
11. Accuracy of prior description of the criminal.
*338 12. Level of certainty demonstrated at the confrontation.
Did the witness express high confidence at the time of the identification before receiving any feedback or other information?
13. The time between the crime and the confrontation. (Encompassed fully by "memory decay” above.)
Id. at 921-22.

. Id. at 920.

. Id.

. Id. at 878.

. Id.

. Id.

. Id.

. Id. at 922.

. Id. at 924.

. These instructions were released a year after the opinion in Henderson.

. Supreme Court of New Jersey, New Jersey Criminal Model Jury Instmctions, Identification: In-Court Identifications Only 2 (2012), http://www.judiciary.state.nj.us/pressrel/2012/ jury_instruction.pdf.

. Id. at 3-9.

. New Jersey is not alone in its response to the vast body of research on the reliability of eyewitness identifications. In 2011, the Justices of the Massachusetts Supreme Judicial Court convened a study group to "offer guidance as to how our courts can most effectively deter unnecessarily suggestive identification procedures and minimize the risk of a wrongful conviction.” Massachusetts Supreme Judicial Court Study Group on Eyewitness Evidence, Report and Recommendations to the Justices 1 (2013) (internal quotation marks omitted). The report made five recommendations aimed at minimizing misidentifications: (1) acknowledge variables affecting identification accuracy; (2) develop a model policy and *339 implement best practices for police departments; (3) expand use of pretrial hearings; (4) expand use of improved jury instructions; and (5) offer continuing education to judges and bar leaders. Id. at 2-5. Like Henderson, the Massachusetts report recommended .that, when a defendant contests the reliability of an eyewitness identification, the trial judge should conduct a pretrial hearing to determine whether law enforcement used suggestive identification procedures to elicit that identification. Id. at 109-16. If a suggestive procedure was used, the report recommended that courts assess whether those procedures impacted the reliability of the identification. Id. at 111. The report suggested that courts consider both estimator and system variables in pre-trial hearings. Id.

. 352 Or. 724, 291 P.3d 673 (2012).

. See id. at 688; State v. Classen, 285 Or. 221, 590 P.2d 1198 (1979).

. Lawson, 291 P.3d at 688-89 (citing Perry v. New Hampshire, - U.S. -, 132 S.Ct. ' 716, 730, 181 L.Ed.2d 694 (2012) ("[T]he Due Process Clause does not require a preliminary judicial inquiry into reliability of an eyewitness identification when the identification was not procured under unnecessary suggestive circumstances arranged by law enforcement.”)).

. Id. at 696-97 (emphasis added).

. Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness’s own testimony.”).

. Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness’s perception; (b) helpful to clearly understanding the witness’s testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.”).

. Lawson, 291 P.3d at 697.

. Id.

. Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.”).

. Lawson, 291 P.3d at 697.

. See, e.g., United States v. Bartlett, 567 F.3d 901, 906 (7th Cir. 2009), cert. denied, 558 U.S. 1147, 130 S.Ct. 1137, 175 L.Ed.2d 971 (2010); United States v. Brownlee, 454 F.3d 131, 141-44 (3d Cir. 2006).

. 454 F.3d 131 (2006).

. Id. at 137.

. Id. at 141.

. Id. at 141-42 (internal quotation marks, citations, and alterations omitted).

. See id. at 144.

. National Research Council, Identifying the Culprit, supra, at 40.

. Id.

. 449 U.S. 341, 350, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (Brennan, J. dissenting) (emphasis added).

. Epstein, supra, 46-48; Elizabeth F. Loftus, Timothy P. O'Toole, & Catharine F. Easterly, Juror Understanding of Eyewitness Testimony: A Survey of 1000 Potential Jurors in the District of Columbia 1 (2004).

. Loftus, O’Toole, & Easterly, supra, at 6.

. Id. at 8.

. Id. at 9.

. J.A. 1237-39.

. Manson v. Brathwaite, 432 U.S. 98, 119, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (Marshall, J., dissenting) (internal alteration omitted) (quoting United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)).

. Id.

. United States v. Brownlee, 454 F.3d 131, 142 (3d Cir. 2006) (internal quotation marks and citations omitted).

. It is important to note that jury instructions are only one of several promising remedies. As we mentioned in our discussion of Brownlee, expert testimony regarding the reliability of eyewitness identifications can also help jurors accurately assess the reliability of such identifications. The National Research Council has also recommended that, where appropriate, trial judges make basic inquiries into eyewitness identification evidence. National Research Council, Identifying the Culprit, supra, at 109-10. As the National Research Council suggested, “while the contours of such an inquiry would need to be established on a case-by-case basis, at a minimum, the judge could inquire about prior lineups, what information had been given to the eyewitness before the lineup, what instructions had been given to the eyewitness in connection with administering the lineup, and whether the lineup had been administered ‘blindly.’ ” Id. at 110.

. Id. at 110.